THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DIANE ALVAREZ, Appellant.

First Department, December 7, 1978

**APPEARANCES OF COUNSEL**

*Harold L. Levy* of counsel *(Flamhaft, Levy & Kamins,* attorneys), for appellant.

*Bruce Allen* of counsel *(Jerrold L. Neugarten* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

LUPIANO, J.

Defendant was found guilty of criminal sale of a controlled substance in the second degree, but not guilty of conspiracy in the first degree. The background of the instant matter is as follows:

A confidential informant, Jason Starr, arranged to have a detective meet one Ronald Berkowitz in order to buy from the latter an ounce of cocaine for $2,200. However, Berkowitz did not appear at the informant's apartment and subsequently the informant and the detective met defendant by chance on the street. Apparently defendant was the girlfriend of Berkowitz. She told them to wait, being en route to a laundry. Upon returning, she informed them that Berkowitz wanted them to go to her apartment. At the apartment, Berkowitz arrived and went to a back bedroom, where he was joined by defendant. Defendant called the informant into the bedroom, leaving the detective alone. Two minutes later, defendant returned to the living room and gave the detective a plastic bag which contained less than one ounce of cocaine. Defendant returned to the bedroom and emerged five minutes later with the informant. Defendant asked the detective for $2,200 for the package. By indictment, defendant was charged with criminal sale of a controlled substance in the second degree, criminal possession of a controlled substance in the third and fifth degrees, and conspiracy in the first degree. Berkowitz was named as the sole coconspirator. Defendant raised the affirmative defenses of duress and entrapment, claiming that the informant had forced her to give the cocaine to the detective. Apparently the trial of the Berkowitz indictment was to follow that of defendant herein.

The following narration enumerates the difficult and troublesome issues raised by defendant's appeal.

It appears that by order signed on January 13, 1976, the court (DONTZIN, J.), on motion of defendant and Berkowitz, directed the People to produce the informant Jason Starr for pretrial interview and to have him available *at trial.* The People made no intimation that they would not or could not produce the informant. After jury selection commenced in the

Alvarez trial, the People on February 24, 1977 moved to reargue that order. They contended that, while they intended to abide by the court's direction by producing the informant at trial, pretrial disclosure was not warranted. The court (DONTZIN, J.) granted reargument and modified its earlier order solely to the extent of denying that part of defendant's and Berkowitz's application which sought pretrial interview. Defense counsel for Berkowitz pointed out that the informant was an eyewitness to the transaction. With respect to the production of the informant at trial, the court declared that there was no need for reargument as the People have complied with the order, i.e., they stated they are producing the witness at trial. Indeed, the Assistant District Attorney declared: "I state to you clearly, the informant in this case will testify * * * The People are clearly ready to expose this witness to the fullest cross-examination at the trial that the rules of evidence will permit." The court pointed out that the People in having the informant present would either call the informant, in which case the defendant could cross-examine, or, if the People did not call the informant, the defendant could call him and that in either of these events defendant's right to a fair trial would be protected. Berkowitz's counsel objected, contending that the informant's testimony would be exculpatory and they (Berkowitz and Alvarez) wanted it prior to trial.

The next day, the trial commenced against defendant Alvarez and on the following court day (Feb. 28, 1977), the District Attorney told the trial court (DAVIS, J.) that the informant had stated through his attorney in Philadelphia that he was in fear of his safety and would not testify. The prosecutor declared that "The informant is now not within our control."

This is not a situation where the informant has effectively disappeared. The court (DONTZIN, J.) had already directed the production of this witness (the informant) and the People represented that not only would they produce, but they would call the witness. Defendant at all times maintained that the informant's testimony would be exculpatory in that it would show that her participation in the crime proceeded from duress. Patently, the test of *People v Goggins* (34 NY2d 163, 169-170, cert den 419 US 1012) was satisfied and the relevance of the informer's testimony to the guilt or innocence of the accused was demonstrated and accepted by the court in directing production of this witness. The Court of Appeals aptly

noted in *People v Jenkins* (41 NY2d 307, 309-310): "However, once the *Goggins* test is satisfied, where an unavailable informant is or has been under the employ or control of law enforcement authorities, *the People have a duty to produce the informant or exert diligent efforts to effect the production of the informant for the defense*. This follows almost apodictically from the *Goggins* mandate, the essential purpose of which is to make an informant possessing material and relevant information available to the defense for examination at trial * * * The ultimate concern, as *Goggins* aptly articulated, is the defendant's 'right of confrontation, due process, and fairness' [citation]". (Italics added.)

■ Since this is not a situation where the informant disappeared, but one where the People knew the whereabouts of the informant, but stated that they could not control the informant, that is, the latter was unwilling to testify, it was incumbent upon the People to exert diligent efforts to effect the production of the informant. Instead, the People, at trial, cast this burden upon the defendant and even argued the merits of whether defendant met the *Goggins* test, which argument missed the point and misled the trial court.

Further, the sudden reversal in the People's position regarding the availability of the informant, in light of their representation at the hearing on their motion to reargue the order directing them to produce the informant, which was held after jury selection began and their representation almost immediately thereafter as the trial got under way, raise the spectre of "bad faith" alluded to in *People v Jenkins (supra)*. The jury having been impaneled and the trial commenced, defendant was entitled under these circumstances either to dismissal of the charge or a new trial (i.e., a mistrial). It must be noted that until the People obtained a modification of the court order directing production of the informant on the eve of trial, they were under an obligation to produce the witness, not only at trial, but for pretrial disclosure. They did not comply with this aspect of the court's directive and succeeded in having it eliminated. Whether this part of the court's original directive was proper or not need not be determined and is not before us. What is critical is that the court granted reargument to the extent of modifying its prior order by eliminating pretrial disclosure upon the express representation by the People that the informant would be produced at trial *and* called by the People.

The trial court, although of the opinion that the People should have complied with the court order sooner, directed that the trial continue and that during the trial the court would take testimony to determine whether the testimony of the informant would be exculpatory, with the defendant having "a heavier burden * * * to show that the testimony would be exculpatory" in view of the court's conclusion that the People were acting in good faith. The trial court also directed the People to make a "real good faith effort" to produce the informant. Patently, from a pragmatic viewpoint, the presence or absence of the informant was a critical factor in the conduct of the People's case and the defense from opening statement, examination and cross-examination of witnesses, through summation and should have been resolved at the initial stages of the trial, rather than left in limbo. Parenthetically, it is noted that defendant took the stand and testified in her own defense. Further, the trial record demonstrated that the *Goggins* test, already fulfilled by virtue of the court order to produce, was sustainable on the basis of the testimony elicited at trial. The testimony of the informant was not only material, it may very well have been crucial.

Prior to summation, the trial court again addressed the unresolved issue of the People's failure to produce the informant. The trial court expressed concern that the informant might testify and "plead the fifth" and stated to defendant that it would let defendant put the informant on the stand initially as an offer of proof, without the presence of the jury, so that defense counsel could determine whether or not he wished to call the informant. Defense counsel acquiesced in this suggestion and unequivocally declared a desire to have the informant produced. The People succeeded in obtaining the trial court's consent to hold the matter in abeyance until after summation by both sides. After summation, but before charging the jury, the trial court again addressed the outstanding issue of the People's nonproduction of the informant. The prosecutor represented to the court that on the evening of the prior day he telephoned the attorney in Philadelphia who represented the informant and that according to previous arrangement made by the People and said attorney, the informant was present and got on the telephone. According to the prosecutor, the informant stated that he would not come to New York voluntarily, but would if ordered to do so. However, he would utilize all legal redress in Pennsylvania to

avoid coming to New York. If unsuccessful, he would testify and not invoke his Fifth Amendment privilege. According to the prosecutor and in response to the latter's questions, the informant stated he would testify that he never threatened the defendant Diane Alvarez.

Defense counsel inquired as to how long it would take for the People to produce the informant and was informed that it could take weeks. Caught in a quandary, defense counsel vacillated on the trial court's offer of an adjournment. The trial court admonished defense counsel that the production of the informant could take weeks and it could not "keep the jury here all that time." Defendant opted to proceed with the trial, with the proviso that the issue of the availability of the informant prior to trial would be resolved. The trial court declared, in effect, that it was satisfied as to the good faith of the People.

Beyond peradventure, the trial proceeded to a point that even if an adjournment were obtained and the informant subsequently produced, his testimony would receive a significance in the minds of the jury far outweighing its reception during the ordinary course of trial. A unique and serious situation was presented to the defense because of the People's failure to produce the informant as directed under circumstances leaving in doubt whether such production would be forthcoming during the ordinary course of trial, or whether bad faith on the People's part was operating. The tactical decision of defense counsel in not moving for dismissal of the indictment or a mistrial must be viewed against the vacillation exhibited by the People relative to their nonfulfillment of the obligation to produce the witness and the trial court's permitting the nonresolution of this critical issue to extend for the entire course of the presentation of evidence and summation (see *People v Moore*, 62 AD2d 930).

At this point, it is well to enumerate other troublesome aspects of this trial. In summation the prosecutor referred to certain expressions (e.g., "sounding," "freaked out," "do a solid") utilized by the defendant in her testimony as indicative of narcotics' jargon and thus demonstrating defendant's familiarity to that extent with the narcotics trade. These expressions are patently "street" words, not in and of themselves indicative of any familiarity with narcotics traffic.

Apparently concerned over the pleasant appearance presented by defendant and her respectable background and

employment record, the prosecutor explained to the jury that there were two types of defendants—one type, the sinister or classic heavy whom the jury would normally envision as engaged in a narcotic transaction. The second type is a person, like defendant—one whose appearance would hardly suggest that she was involved with criminality. The prosecutor then told the jury that street junkies get convicted on the same evidence as "you convict Diane Alvarez." In this manner the prosecutor explained he was demonstrating that defendant "does in fact know something about narcotics."

■ Patently, defendant was entitled to be acquitted or convicted on the evidence presented at trial. There was no reason to equate defendant with a street junkie, nor did the record demonstrate that defendant was such a junkie.

Rhetoric by the prosecutor extended to quoting Ulysses S. Grant: "Let no guilty person escape if it can be avoided" and to asserting that the equal protection clause of the United States Constitution mandated "equal accountability". In ending his summation, the prosecutor stated: "At the end of this case, there is no way of knowing if you will come in with a not guilty verdict. But I leave you with this thought: Can it be now that there is even one of you who have not been convinced beyond a reasonable doubt of the defendant's guilt? If that happens in the Jury Room, I say this: Ask the other eleven jurors." This latter comment possesses the evil of suggesting to a juror that if he believed the defendant was not guilty, but the other jurors believed the defendant to be guilty, the minority juror should accede to the will of the majority.

The excessive zeal of the prosecutor on summation, as narrated above, went unopposed by defense counsel.

■ Another troublesome aspect is the fact that the trial court's charge, while essentially correct, contains a misstatement of law. In initially charging on the affirmative defenses of duress and entrapment, the trial court correctly described the defendant's burden as being "by a preponderance of the evidence." However, subsequently in the charge, the court declared: "Now, with respect to the affirmative defenses of duress and entrapment, I think I mentioned there that if you found that such defenses had been established by a preponderance of the evidence by the defendant, then you *could* find her not guilty of those counts. Actually, if you find that either one of those defenses has been established *beyond a reasonable*

*doubt,* it only goes to the sale, where you would have to find her not guilty" (emphasis supplied). This was erroneous and coming at the very end of the court's charge may well have obtained great significance. Moreover, the trial court used the inappropriate word "could."

■ Hearsay statements by the prosecutor as to what the informant would testify to at trial cannot, of course, substitute for admissible evidence. Even assuming such utterances to be true, it is one thing to make a statement not under oath and another to make it under oath before a court subject to the opportunity of cross-examination and confrontation. Also presenting a problem was the issue raised by defendant as to her entitlement to a "missing witness" charge. This narrowed down to the question of "control" on the People's part respecting the informant (see *People v Douglas,* 54 AD2d 515). The trial court refused to so charge. A disquieting fear that the issue of control was not properly focussed upon in the context of the unusual circumstances surrounding this case mandates affording the defendant a new trial (see *People v Zayas,* 61 AD2d 594).

In view of the aforesaid, it is concluded that, although no objection was made by defense counsel to these errors, the cumulative effect of such errors clearly deprived defendant of a fair trial. Under these circumstances, the court chooses to exercise its discretionary power to reverse in the interest of justice (CPL 470.15, subd 6, par [a]).

If we were not reversing, we would take note of grave doubt as to the propriety of the sentence of six years to life received by defendant. The probation report discloses that defendant, a young woman with a good work record and respectable background, had no prior conflicts with the law and that the crime was uncharacteristic, perhaps due to defendant's romantic involvement with Berkowitz with whom it was alleged in the indictment she conspired to sell and possess the cocaine. Indeed at sentencing, the court declared that having read the probation report, it was unable to find out how she "ever got mixed up in this" and that in light of the mandatory sentence, it had no option but to sentence defendant to six years to life. In upholding the constitutionality of the criminal drug statutes, including their mandatory sentencing provisions, the Court of Appeals observed in *People v Broadie* (37 NY2d 100, 118-119) that "because of the Legislature's rational view of the gravity of the offenses, the language posed by the offenders,

and the penological purposes to be served, the punishments imposed for these crimes in the present state of man's knowledge were not grossly disproportionate or cruel and unusual in the constitutional sense * * * This is not to say that in some rare case on its particular facts it may not be found that the statutes have been unconstitutionally applied (cf. *Furman v Georgia,* 408 US 238, 460-461 [POWELL, J., dissenting])." The instant case may well be that rare case envisioned in *Broadie.* Indeed, at sentencing the People declared as follows: '[T]raditionally * * * the People refrain from making statements on the question of sentence. This case would be an exception. All I will say is that, based upon the information we have as to this defendant, including the level of her involvement and the frequency of times in which she was involved in narcotics, it is the People's belief that that minimum term that you are allowed to impose would be the appropriate sentence in this case * * * I don't think this defendant, based on the facts I indicated, deserves any more than the minimum the law provides."

Accordingly, the judgment of the Supreme Court, New York County (DAVIS, J.), rendered April 20, 1977, convicting defendant, after a jury trial, of criminal sale of a controlled substance in the second degree and sentencing her to a term of six years to life, should be reversed, on the law, and as a matter of discretion in the interest of justice, and new trial ordered.

SULLIVAN, J. (concurring). I concur in the reversal of the conviction and direction for a new trial. For purposes of the disposition of this appeal, however, it is both premature and inappropriate to reach the issue of whether the sentence imposed is unconstitutional, inasmuch as the case has to be retried.

Moreover, I disagree with that part of the majority opinion which intimates that this may be that rare case where the application of the mandated life sentence with a minimum would be unconstitutional. (See *People v Broadie,* 37 NY2d 100, 119.) This is hardly the case for the exception envisioned in *Broadie (supra).* Defendant's middle class background, good reputation, and lack of previous criminal involvement would likely be applicable to many users and sellers of cocaine. Setting aside for the moment the reasons which compel a new trial, it is obvious from the proof that defendant was not involved by mere happenstance, and it strains credulity to

believe that she was not a vital cog in the transaction for which she was convicted.

Evans and Markewich, JJ., concur with Lupiano, J. P.; Sullivan, J., concurs in an opinion.

Judgment, Supreme Court, New York County, rendered on April 20, 1977, unanimously reversed, on the law, and as a matter of discretion in the interest of justice, and a new trial ordered.